Jacquelyn CREIGHTON,
Plaintiff/Appellant,

v.

James F. CONWAY, et al.,
Defendants/Respondents.

No. 69464.

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 8, 1997.

Application to Transfer Denied
Feb. 25, 1997.

---

**3.** Section 537.095.4(2) requires the court to order the claimant to pay attorney fees as contracted.

Helton Reed, St. Louis, for Plaintiff/Appellant.

Michael R. Stelzer, Patricia A. Hageman, Asst. City Counselors, St. Louis, for Defendants/Respondents.

KAROHL, Judge.

Plaintiff, Jacquelyn Creighton, appeals after summary judgment in favor of defendants, members of the Board of Police Commissioners of the City of St. Louis, entered on October 2, 1995, on her petition for personal injuries sustained when her vehicle was struck by a police vehicle operated by Officer John Sabin.

In her petition, Creighton alleged, 1) defendants were members of the Board of Police Commissioners of the City of St. Louis, employer of City of St. Louis Police Officers; 2) Sabin was a City of St. Louis police officer acting in his official capacity; 3) Sabin, as such a police officer, was the employee, servant and agent of the Board of Police Commissioners acting within the course and scope of his employment; 4) on October 28, 1991, Creighton was driving east on Switzer Avenue at its intersection with Riverview Boulevard; 5) at the same time, Sabin was driving his patrol car north on Riverview Boulevard; 6) the electric signal at the Switzer and Riverview intersection showed green in Creighton's favor and red for north-south traffic on Riverview; 7) Sabin's patrol car collided with Creighton's car because Sabin was negligently driving at a dangerous and

excessive speed, failed to give a signal or warning of his approach, failed to slow, stop or swerve, and drove in violation of the red light; 8) Creighton suffered, as a direct and proximate result of Sabin's negligence, several injuries; and, 9) Creighton spent approximately $1,000.00 for medical care and treatment and will have to spend more in the future.

Defendants filed a motion for summary judgment on the theory of official immunity. In the motion, defendants alleged there was no genuine issue of material fact that at the time of the collision, Sabin was responding to an emergency call regarding a fatal traffic accident and he had his light and siren activated. Defendants alleged Sabin was entitled to official immunity because he was an officer "engaged in a discretionary act proceeding with the lights and siren activated." They also alleged where there are "no grounds for recovery due to the alleged negligence of a police officer, and where the officer's employer is sued under the theory of respondeat superior [as in this action], there are also no grounds for recovery against the officer's employer." In support of the motion for summary judgment, defendants filed a memorandum of law, an affidavit of Minnie Phillips, an independent witness and deposition testimony of Officer Sabin and Creighton.

Creighton filed a response but did not file counter affidavits. She argued there was a genuine issue of material fact whether: (1) Sabin was responding to a "fatal" accident and (2) Sabin was merely performing a ministerial act while violating department regulations. Creighton relied on Sabin's testimony, he did not learn of the traffic death until hours after his collision with her car. She also relied on Sabin's reference to the pursuit policy of the Metropolitan Police Department–City of St. Louis.

The trial court granted defendants' motion for summary judgment. It found Creighton had failed to demonstrate any genuine issue of fact that:

THE POLICE OFFICER WAS RESPONDING TO A RADIO DISPATCH FOR AN AUTOMOBILE ACCIDENT WITH INJURIES; SUCH CALLS ARE PRIORITY ONE CALLS REQUIRING ACTIVATION OF LIGHTS AND SIREN; AND THE OFFICER WAS RESPONDING TO THE CALL WITH LIGHTS AND SIRENS ACTIVATED.

It concluded:

THE OFFICER'S ACTIONS IN RESPONDING TO THE CALL WERE WITHIN THE SCOPE AND COURSE OF HIS EMPLOYMENT, AND THAT THEY REQUIRED THE EXERCISE OF HIS DISCRETION IN DETERMINING SPEED, OBSERVANCE OF TRAFFIC REGULATIONS AND OTHER MATTERS GENERALLY RELATED TO THE SAFE CONTROL OF HIS VEHICLE. THE OFFICER IS, THEREFORE, ENTITLED TO THE PROTECTION OF OFFICIAL IMMUNITY FROM TORT LIABILITY; AND THE DEFENDANTS, WHO ARE SUED UNDER THE THEORY OF RESPONDEAT SUPERIOR, ARE, LIKEWISE, CLOTHED WITH SUCH IMMUNITY.

Defendants have responded on the merits without comment on Creighton's reliance on an outdated standard of review in summary judgment cases. Creighton should be aware "unassailable proof" that there is no issue of fact to be tried is no longer the standard. Her reliance on *Swink v. Swink,* 367 S.W.2d 575 (Mo.1963) is misplaced. In 1988, the Missouri Supreme Court amended Rule 74.04 removing the "unassailable proof" standard. *ITT Commercial Finance v. Mid–Am. Marine,* 854 S.W.2d 371, 378 (Mo. banc 1993).

When considering appeals from summary judgments, we will review the record in the light most favorable to the party against whom judgment was entered. *Id.* at 376. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* Summary judgment is appropriate if the motion and response thereto show "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 74.04(c)(3).

As a governmental official, Officer Sabin is shielded from liability for torts arising out of his discretionary acts or omissions. *Kanagawa v. State By and Through Freeman*, 685 S.W.2d 831, 835 (Mo. banc 1985); *Anderson v. Jones*, 902 S.W.2d 889, 891 (Mo. App. E.D.1995). However, he may be liable for negligently performing ministerial duties. *Id.* A police officer driving on the public streets and highways in a non-emergency situation is not shielded from liability for the negligent operation of his vehicle. *Brown v. Tate*, 888 S.W.2d 413, 415 (Mo.App. W.D. 1994).

Creighton's first point on appeal confuses the concepts of "emergency vehicle" and "emergency call." An "emergency vehicle" is defined in the statute as including "those vehicles operated by ... traffic officer." Section 304.022.3(1) RSMo 1994. "Emergency call" is a separate concept. Section 304.022.4(1) provides "[t]he driver of any vehicle referred to in subsection 3 of this section shall not sound the siren thereon or have the front red lights or blue lights on except when such vehicle is responding to an emergency call ..." Section 304.022.4(2) permits the operator of an emergency vehicle to "[p]roceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation; [and] ... [e]xceed the prima facie speed limit so long as he does not endanger life or property ..." The exemptions apply "only when the driver ... while in motion sounds audible signal by bell, siren, or exhaust whistle ... and when the vehicle is equipped with at least one lighted lamp displaying a red light or blue light ..." Section 304.022.4(3) RSMo 1994.

The dispositive issue is whether, as a summary judgment fact, the police officer was responding to an emergency call when the accident occurred. The evidence regarding the nature and circumstances surrounding the officer's "priority one" call to the accident scene was unopposed. On October 28, 1991 at 8:25 a.m., the officer received a call over his radio that the dispatcher was receiving multiple reports of an accident with injuries involving an overturned Jeep on Broadway. According to the police department regulations, an accident with injuries is a priority one call which means the officer is to proceed with lights and sirens. Officer Sabin's response was to an emergency call. It is irrelevant that he did not learn the call involved a fatality until many hours after his own accident. The trial court correctly found, as undisputed facts, Officer Sabin's vehicle was on an emergency call when he collided with Creighton.

Creighton also argues the court erred in granting summary judgment because there was a question whether the officer activated the proper emergency equipment or whether he was traveling too fast. The statute places limitations on an officer's ability to operate his vehicle in whatever manner he deems necessary. It requires use of both light and siren before disregarding traffic rules that bind all drivers. *McGuckin v. City of St. Louis*, 910 S.W.2d 842, 845 (Mo. App. E.D.1995). Once an officer complies with these two mandates, he brings himself under the protective umbrella of the statute and can then exercise his judgment in responding to the situation as the circumstances warrant. *Id.*

Officer Sabin and an independent witness alleged in testimony and affidavit that the police car's lights and siren were operating at the time of the collision. These allegations were not opposed by Creighton's testimony that she did not hear a siren. She admitted it was possible she might not have heard the siren because her radio and windshield wipers were operating. Her response was not sufficient to preserve a *genuine* issue of material fact.

"Genuine" implies that the issue, or dispute, must be a real and substantial one— one consisting not merely of conjecture, theory and possibilities. Too often, courts have confused "slightest doubt" with "slightest possibility." To the extent that trial and appellate courts are of the impression that the "slightest doubt" standard defeats summary judgment when *any* doubt exists, no matter how unreasonable, the standard [has] been misapplied and is now abandoned. *ITT Commercial Finance*, 854 S.W.2d at 378.

The use of required emergency equipment was an undisputed summary judgment fact.

■ Creighton's argument that the officer's speed at the time of the accident remains a genuine issue of material fact is misguided. Creighton makes the same argument the plaintiffs made in *Costello v. City of Ellisville*, 921 S.W.2d 134, 137 (Mo.App. E.D. 1996). She argues the language of the statute not only mandates an officer utilize his or her lights and siren, but that it also requires an officer operating an emergency vehicle to slow down when proceeding through an intersection and not to exceed the speed limit when it would endanger life or property. *Id.* at 137. We rejected this argument in *Costello*. In that case we found the provisions in the statute "merely suggest how the driver of an emergency vehicle should proceed *depending on the particular circumstances surrounding him or her at the time.*" *Id.* An officer's decision determining what speed he or she can maneuver through an intersection against a signal or at what speed in excess of the speed limit he or she can safely travel under existing traffic conditions is an exercise of discretion. *Id.* It is in this exercise of discretion that an officer is shielded from liability by official immunity. *Id.*

The unopposed summary judgment facts support the findings Officer Sabin: (1) responded to an emergency call in his emergency vehicle, (2) had activated his siren and lights and (3) reasonably exercised his discretion in determining his speed and observance of traffic regulations. He was therefore entitled to the protection of official immunity from tort liability. Defendants were sued under a theory of respondeat superior. Any liability against them would be derivative of Officer Sabin. Because he can not be liable, neither can defendants. *State ex rel. Conway v. Dowd*, 922 S.W.2d 461, 463 (Mo.App. E.D.1996).

We affirm.

RHODES RUSSELL, P.J., and SIMON, J., concur.

STATE of Missouri, Plaintiff/Respondent,

v.

Ronald E. GEORGE,
Defendant/Appellant.

Ronald E. GEORGE, Movant/Appellant,

v.

STATE of Missouri,
Respondent/Respondent.

Nos. 67883, 69985.

Missouri Court of Appeals,
Eastern District,
Division One.

Nov. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 1997.

Application to Transfer Denied
Feb. 25, 1997.

an oak bench and said that he would strike or kill anyone that came close to him.

Numerous staff members attempted to calm defendant down. His behavior, however, continued to escalate, and he became more angry and upset. When he screamed that he wanted a light for his cigarette, Barnes approached defendant and offered him a light. As defendant leaned forward, Barnes dropped his lighter and brought defendant to the floor.

Defendant punched Barnes in the eye, and the other staff members kept defendant on the floor. Defendant screamed that Barnes had suckered him and that he was going to kill Barnes. Defendant stated that he was happy he had punched Barnes. Barnes left the area briefly to check his injury and discovered a small, bleeding cut under his eye.

While Erger was helping to control and hold down defendant, he bit her leg through her trousers. After defendant was restrained, Erger received treatment for her injury. The wound was cleaned, and she received a tetanus shot. A quarter-sized piece of skin had to be placed back on her leg. Erger's leg became swollen and bruised. The bite later became infected, and she had to have an incision to remove a hematoma. Erger was able to work only part-time for approximately two months. She testified that she suffers from discomfort and that her leg is disfigured.

Defendant's sole point on direct appeal alleges that the trial court "erred in denying defense counsel the opportunity to use consent as a defense under Section 565.080, because this ruling deprived [defendant] of his rights to present a defense ... in that the physical injuries inflicted by [defendant] and [defendant's] conduct were reasonably foreseeable risks to security guards Barnes and Erger." [1]

Section 565.080, RSMo 1986, provides:

1. When conduct is charged to constitute an offense because it causes or threatens physical injury, consent to that conduct

Ellen H. Flottman, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, for respondent.

REINHARD, Judge.

Defendant appeals after he was convicted by a jury of one count of second degree assault, § 565.060, RSMo 1994, and one count of third degree assault, § 565.070, RSMo 1994. The court found defendant to be a prior offender and sentenced him to a prison term of five years for assault in the second degree and a concurrent prison term of one year for assault in the third degree. Defendant also appeals the denial, without an evidentiary hearing, of his Rule 29.15 motion for post-conviction relief. We affirm.

The evidence reveals that on December 2, 1993, defendant was a patient at the psychiatric intensive care unit at St. Anthony's Hospital in South St. Louis County. About mid-day defendant became angry, agitated, and upset. He demanded medication, yelled, and paced the floor. Karen Zoeller, a nurse, tried to calm him down by talking with him. Another nurse gave defendant Librium, a tranquilizer, to decrease his agitation, but defendant did not respond to the medication.

After several hours had passed, defendant's behavior became more violent and threatening. Hospital security was notified. When Dusty Barnes and Mary Ann Erger, security personnel within the hospital, responded to the call, defendant was moving up and down the hallway saying that "somebody was going to get hurt." Defendant picked up

1. The trial court faced the issue of consent as a defense when the state filed a motion in limine to prohibit defendant from adducing evidence of similar incidents. From the discussion in chambers, discovery had revealed "previous assaults or assaultive type behavior that's happened at the hospital earlier." The court sustained the state's motion and no specific offer of proof was made.

or to the infliction of the injury is a defense only if:

(1) The physical injury consented to or threatened by the conduct is not serious physical injury; or

(2) The conduct and the harm are reasonably foreseeable hazards of

(a) The victim's occupation or profession; or

(b) Joint participation in a lawful athletic contest or competitive sport; or

(3) The consent establishes a justification for the conduct under chapter 563 of this code.

2. The defendant shall have the burden of injecting the issue of consent.[2]

■ Apparently no Missouri cases have cited this statute. However, "in limited circumstances, consent is a 'defense' to any degree of assault." *State v. Dunlap,* 639 S.W.2d 201, 206 (Mo.App. E.D.1982); *See also* Notes on Use 5 and 6 to MAI–CR 3d 319.02. According to § 556.061, RSMo Supp. 1993, consent may be either expressed or implied. *See also* MAI–CR 3d 333.00.

Defendant urges that because of the nature of the guards' job, they consented to assaultive behavior. The state, however, argues that the security officers did not consent to defendant's conduct, and although they may have consented to "minor physical injuries which arise out of ordinary interactions" by virtue of their occupation, defendant exceeded the scope of any such consent.

When the Missouri legislature adopted a version of the Model Penal Code, it included a provision that was not in the model code. *Cf.* MODEL PENAL CODE § 2.11 (1962) *with* § 565.080, RSMo 1986.[3] Our research reveals that few states, which adopted statutes similar to the Model Penal Code, have included a provision setting forth consent as a

defense by nature of one's occupation. *See e.g.,* ME.REV.STAT.ANN. tit. 17–A, § 109 (West 1995); N.D.CENT.CODE § 12.1–17–08 (1995); TEX. PENAL CODE ANN. § 22.06 (West 1996). The only case cited to us interpreting such a statute is *Tanksley v. State,* 656 S.W.2d 194 (Tex.Ct.App.1983).

In deciding to disallow evidence supporting the defendant's consent defense, the trial court in this case relied upon W.E. Shipley, Annotation, *Consent as Defense to Charge of Criminal Assault and Battery,* 58 A.L.R.3d 662 (1974). This annotation provides that when considering consent as a defense in battery or assault cases without sexual overtones, other jurisdictions "have usually taken the view that since the offense in question involved a breach of the public peace as well as an invasion of the victim's physical security, the victim's consent would not be recognized as a defense...." *Id.*

This annotation also cites a Maryland case, which stands for the proposition that "[a] criminal assault which tends to bring about a breach of the public peace is treated as a crime against the public generally, and therefore the consent of the victim is no defense." *Taylor v. State,* 214 Md. 156, 133 A.2d 414, 415 (1957) (finding assault with attempt to commit sodomy against juvenile is crime against public generally, and victim's consent is no defense).

The trial court in this case also relied upon § 10.13 of THE NEW MISSOURI CRIMINAL CODE: A MANUAL FOR COURT RELATED PERSONNEL (n.d.). This manual discusses § 565.080 and provides "if the injury is a reasonably foreseeable hazard of the victim's employment he may be deemed to consent to the risk of injury by accepting the employment. An example would be military or police training exercises."

---

2. This statute was adopted in 1977 and became effective on January 1, 1979. The Comment to the 1973 proposed code provides:

Because some physical injuries are not criminal if consented to, a section dealing with consent is needed. This section allows consent as a defense if the physical injury is not serious. Where serious physical injury is involved consent as a defense is limited to the situations covered by subsections 1(2) and (3). The ma-

jor area under the justification sections will be medical treatment where serious physical injury can lawfully be consented to.

Mo.ANN.STAT. § 565.080 (Vernon 1979).

3. Section 2.11 of the Model Penal Code provides that the victim's consent is a defense. Unlike the Missouri statute, however, the Model Penal Code does not have a section setting out consent as a defense in the context of a victim's occupation.

In *Tanksley v. State, supra,* an imprisoned defendant called a jailer to the holding cell window. *Tanksley,* 656 S.W.2d at 195. The defendant, while holding a sharpened toothbrush handle, stated that he would stab the jailer in the eye when the holding cell door was opened. *Id.* The defendant was convicted of aggravated assault. At trial, the jailer admitted that "inmates are sometimes belligerent, that while he was rarely threatened, he had been insulted 'verbally' and abused a few times while working in the jail." *Id.*

On appeal, the defendant argued that "by the nature of the jailer's employment he consented ... to any assault as a risk of his occupation, within the meaning of Tex.Pen. Code Ann. § 22.06(2)(A) (1974)." *Id.*[4] The court found that the provisions of the Texas Code "do not *define* effective consent to mean engaging in an occupation having a risk of assault." *Id.* at 197. Although a "victim's express or apparent assent to an accused's conduct is effective as a defense *if* the victim knew that such conduct was a risk of his occupation," the court found the jailer did not assent to the defendant's conduct. *Id.*

In the case at hand, defendant relies upon the literal reading of § 565.080 to support his contention that he was entitled to the consent defense. Defendant admits in his brief, however, there are no Missouri cases on point. Therefore, he relies upon two cases from other jurisdictions involving the issue of assumption of risk. *See Burrows v. Hawaiian Trust Company,* 49 Haw. 351, 417 P.2d 816 (1966); *Mullen v. Bruce,* 168 Cal.App.2d 494, 335 P.2d 945 (1959). We do not find either case to be persuasive. Assumption of risk cases are civil matters involving money damages, an award of which will benefit the victim. These matters differ from criminal cases, which involve not only the defendant and the victim, but also the public.

4. Section 22.06 of the Texas Penal Code provides:
 The victim's effective consent ... to the actor's conduct is a defense to prosecution under Section 22.01 (Assault) [or] 22.02 (Aggravated Assault) ... if:
 * * * * * *
 (2) the victim knew the conduct was a risk of:

■ For example, in *State v. Fransua,* 85 N.M. 173, 510 P.2d 106 (App.1973), defendant and victim were in a bar drinking heavily. After an argument, defendant stated that if he had a gun, he would shoot victim. *Id.* 510 P.2d at 107. The victim then brought defendant a gun and told him "if he wanted to shoot me to go ahead." *Id.* Defendant shot victim, and at trial, defendant argued that victim consented to the shooting. *Id.* The court disagreed. The New Mexico court found:

> It is generally conceded that a state enacts criminal statutes making certain violent acts crimes for at least two reasons: One reason is to protect the persons of its citizens; the second, however, is to prevent a breach of the public peace. While we entertain little sympathy for either the victim's absurd actions or the defendant's equally unjustified act of pulling the trigger, we will not permit the defense of consent to be raised in such cases.... [T]he public has a stronger and overriding interest in preventing and prohibiting acts such as these.

*Id.* (citations omitted). The overriding concern for public protection makes consent ineffective as a defense in certain cases.

After examining the trial court's analysis, we conclude it did not err in denying defendant the use of consent as a defense.

An intentional assault which occurs while working as a hospital guard differs from participating in military or police training exercises. In the latter example, an individual has consented to reasonably foreseeable injuries that may occur. In this case, however, there was no evidence that the security officers consented to the assault. Defendant said he was glad he had punched Barnes in the face, and then he bit Erger. This was an intentional assault.

 (A) his occupation.

■ By enacting the consent statute, the legislature did not intend to legalize intentional criminal assaults on persons engaged in the security profession. Rather, the legislature intended to "accommodate the assault law to reality, in that many acts which our society considers to be quite acceptable, and even desirable, are technically assaults by whatever rational definition that term may be given." *State v. Floyd,* 466 N.W.2d 919, 922 (Iowa.Ct.App.1990) (*quoting* J. Yeager & R. Carlson, *Iowa Practice: Criminal Law and Procedure* § 176 (1979)).

For instance, in *State v. Floyd, supra,* a fight erupted during an aggressive basketball game. *Id.* at 920–21. The court discussed the issue of consent to an assault occurring during a sporting event and found that the legislature "contemplated a person who commits acts during the course of play, and the exception seeks to protect those whose acts otherwise subject to prosecution are committed in furtherance of the object of the sport." *Id.* at 922. The court found at the time of the altercation, defendant and his victims were not "voluntary participants in a sport." *Id.* The court added, however, that even if the defendant and his victims were sport participants, "[i]t strains the imagination and contorts the concept of foreseeability beyond recognition to assert that the brutal assaults carried out by defendant ... could have been 'reasonably foreseeable incident[s].'" *Id.* at 923.

■ In the present case, it would be illogical to condone defendant's intentional assault of two guards simply because of the victims' profession. The consent statute was intended to protect acceptable acts committed during employment that would otherwise be subject to prosecution but which are committed in furtherance of one's employment. Authorizing a person to assault a worker who attempts to calm a person's abusive or disruptive behavior would not further the statute's intention. Rather, allowing the consent statute to legalize intentional assaults would thwart the purpose of Missouri's statutes criminalizing assaultive behavior.

■ In addition, Missouri's legislature has expressed a position against assaulting public servants who enforce the law. These stat-utes specifically protect correctional center employees and law enforcement officers. *See* §§ 217.385, 565.081, 565.082, 565.083, RSMo Supp.1993. Just as the consent statute would not be a valid defense to assaulting a police officer or correctional center employee, it cannot be a defense under the circumstances of this case.

■ Furthermore, in judging the validity of the statute, "we must be guided by 'robust common sense'." *Caesar's Health Club v. St. Louis County,* 565 S.W.2d 783, 789 (Mo.App. E.D.1978). Common sense suggests that while the statute's terms insinuate consent is a defense to foreseeable and intentional assaults occurring within the victim's occupation, the statute cannot reasonably be construed to provide a defense to such conduct. *Id.* We can infer that a security guard at a hospital or other business who is aware of previous assaults against his or her co-workers does not consent to future assaults against him or her. Without such an inference, it is foreseeable that convenience store workers, service station attendants, or bank tellers, who are working where previous assaults have occurred, would be assaulted, and the assailant would go unpunished for such behavior. We do not think the legislature intended the consent defense to encompass such situations.

We conclude that the trial court did not err.

■ In defendant's second point on appeal, he alleges:

> The motion court clearly erred in denying [defendant's] Rule 29.15 motion without granting an evidentiary hearing pursuant to Rule 29.15(g), because [defendant's] motion pleaded factual allegations which, if proved, would warrant relief and which are not refuted by the record, in that [defendant] claimed he was denied his right to effective assistance of counsel ... when trial counsel refused to allow [defendant] to testify in his own behalf.

The motion court found that an evidentiary hearing was not necessary because defendant failed to set forth any factual allegations warranting relief in his motion for post-conviction relief. The motion court further found defendant's "allegation that the trial

counsel misguided him by advising him not to testify is without merit and [is] refuted by the record." The motion court noted that defendant did not provide the proposed content of his testimony or to show how such testimony would have caused the jury to acquit him.

 Our review is limited to determining whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15; *Brummell v. State,* 770 S.W.2d 379, 380 (Mo.App. E.D.1989). Such findings and conclusions will be found clearly erroneous only if a review of the entire record leaves this court with a definite and firm impression that a mistake has been made. *Id.* To be entitled to an evidentiary hearing, a movant must cite facts not conclusions, which, if true, would warrant relief; the factual allegations must not be refuted by the record; and the matters complained of must have prejudiced the movant. *State v. Blankenship,* 830 S.W.2d 1, 16 (Mo. banc 1992).

 To prevail on a claim of ineffective assistance of counsel, a movant must show, by a preponderance of the evidence, that counsel's performance was deficient and that the deficient performance prejudiced movant's defense. *State v. Henderson,* 826 S.W.2d 371, 377 (Mo.App. E.D.1992) (*citing Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984)). To prove deficient performance, a movant must show that counsel's acts or omissions were outside the range of professionally competent assistance. *Henderson,* 826 S.W.2d at 378. Prejudice is shown when there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Id.* If a movant fails to show either deficient performance or prejudice, the court need not address the other component. *State v. Mueller,* 872 S.W.2d 559, 566 (Mo.App. E.D.1994).

 Furthermore, an attorney's advice regarding whether or not a defendant should testify is a matter of trial strategy. *State v. Williams,* 853 S.W.2d 371, 377–78 (Mo.App. E.D.1993). "Barring exceptional circumstances, such a claim is not a ground for relief." *Id.* at 378.

Defendant's claim is refuted by the record. After the state rested, defendant's attorney stated that "the defendant no longer wants to testify." At the sentencing hearing, the following discussion took place:

[Court]: Did [your attorney] present the case the way you wanted her to present it as far as investigating it and presenting your defense?

[Defendant]: I feel she done what she felt was necessary. I don't—I think that I should have took the stand because there was only one side of the story told. I mean, it's—

[Court]: I recall back in the trial that that was a concern that you and your attorney had about whether you should testify or not. And at that time I guess she convinced you that you shouldn't testify. Is that basically what happened?

[Defendant]: Yeah

[Court]: ... But the case as far as you biting the lady, that's pretty clear-cut.

[Defendant]: Yeah

[Court]: Even if you had testified, it would have been very difficult for the jury to not convict you either way. So that was really sort of a trial strategy-type thing that your attorney talked to you about.

[Defendant]: Yeah

[Court]: Other than that, is there anything else you wanted her to do that she didn't do?

[Defendant]: No. No.

[Court]: All right. So are you satisfied with her services?

[Defendant]: Yeah.

According to defendant, trial counsel did not refuse to let him testify but rather advised him not to testify as a matter of trial strategy. Therefore, defendant's second point is refuted by the record.

Moreover, defendant's post-conviction motion did not allege sufficient facts entitling him to relief. By not including the content of his proposed testimony, movant did not show how he was prejudiced by his attorney's alleged refusal to present his testimony. The motion court's denial of defendant's post-conviction motion without an evidentiary hearing was not clearly erroneous.

Defendant's third point on appeal alleges that:

The motion court clearly erred in denying [defendant's] Rule 29.15 motion because

postconviction counsel rendered ineffective assistance of counsel ... in that postconviction counsel failed to act as a reasonably competent attorney when she failed to sufficiently allege facts and grounds for post-conviction relief by grossly misstating the facts of appellant's case and the issues at trial in the amended motion.

Although defendant alleges that his post-conviction counsel grossly misstated the facts and issues of his case, defendant concedes that the post-conviction counsel filed a timely, verified amended motion.

Allegations regarding ineffective assistance of post-conviction counsel are categorically unreviewable. *State v. Ervin*, 835 S.W.2d 905, 928–29 (Mo.1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Feltrop*, 803 S.W.2d 1, 19 (Mo.), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). Therefore, defendant's point must fail.

Judgment affirmed.

DOWD, P.J., and GARY M. GAERTNER, J., concur.

**Earl KAMP and Jessie Kamp, his wife, Plaintiffs/Respondents,**

v.

**Kirby GRANTHAM and Deborah Grantham, his wife, Defendants/Appellants.**

**No. 69700.**

Missouri Court of Appeals, Eastern District, Southern Division.

Nov. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 8, 1997.

Application to Transfer Denied Feb. 25, 1997.

Albert C. Lowes, Cape Girardeau, for defandants/appellants.

Malcolm H. Montgomery, Johnson, Montgomery & Maguire, Cape Girardeau, for plaintiffs/respondents.

GRIMM, Judge.

In this non-jury matter, an associate circuit court judge granted plaintiffs judgment against defendants for $6,426.25. Defendants appeal, raising two issues.

■ The first is decisive. In it, defendants allege the associate circuit court judge lacked jurisdiction to enter judgment because judgment was not entered within thirty days after submission as required by § 517.111.2, RSMo 1994. We agree, and remand for entry of a new judgment.

The procedural background discloses that plaintiffs filed their petition in 1994. In that petition, they sought $6,426.25 for rent they paid which they contend defendants should have paid. Ultimately, the cause was tried and submitted on September 22, 1995. The trial court entered judgment on November 20, 1995.

### I. Judgment is Void

■ Chapter 517 of the Missouri Revised Statutes pertains to procedures before associate circuit judges in certain matters. The parties agree that § 517.111.2 is applicable. It states:

When a case is tried before a judge without a jury, judgment shall be entered by the judge within thirty days after the case is submitted for final decision unless the parties consent to a longer period of time.

The southern district applied this statute to facts similar to ours in two cases, *Stellwagen v. Gates*, 758 S.W.2d 195 (Mo.App. S.D.1988) and *Larimer v. Robertson*, 800 S.W.2d 154 (Mo.App. S.D.1990). In *Stellwagen*, the associate circuit court judge entered judgment more than six months after submission. In *Larimer*, the associate circuit court judge entered judgment approximately four months after trial. In each case, our southern district colleagues held that the purported judgments were void because (1) they were not entered within 30 days after submission and (2) the parties had not consented to a longer period. *Stellwagen*, 758 S.W.2d at 197; *Larimer*, 800 S.W.2d at 155.

In the case before us, the associate circuit court judge rendered judgment approximately two months after submission. Neither party contends that consent was given for a longer period of time. Thus, pursuant to the holdings in *Stellwagen* and *Larimer*, we hold that the purported judgment of November 20, 1995, is void. See also, *State ex rel. M.J. Gorzik Corp. v. Mosman*, 315 S.W.2d 209 (Mo.Div.1 1958) (Under a similar predecessor statute, supreme court held that a judgment rendered after time limit "was void." *Id.* at 213).

### II. Procedure on Remand

■ Defendants argue that on remand, a new trial should be granted. They acknowledge that under the predecessor statute discussed in *Mosman*, the supreme court did not order a new trial. Rather, the court remanded the case to the trial judge for entry of a new judgment without hearing further evidence. *Mosman*, 315 S.W.2d at 214.

Nevertheless, they contend amendments to the statute in 1985 mandate a new trial. We disagree. The 1985 amendments changed the time for the judge to render the decision from 3 days to 30 days and also allowed the parties to consent to a longer period of time. Like our southern district colleagues, we fail to see how a longer period of time could alter the consequences of the judge's failure to enter judgment within the time allowed. *Stellwagen*, 758 S.W.2d at 197.

■ It is unfortunate that this case cannot be finally concluded by a decision on the merits. However, because the purported judgment is void, a final judgment is not before us. This court has no jurisdiction to review a void judgment. *Schneider v. Sunset Pools of St. Louis*, 700 S.W.2d 137, 138 (Mo.App. E.D.1985).

The appeal is dismissed and the cause is remanded to the Associate Division of Cape Girardeau County Circuit Court. This court directs Judge Raymond H. Weber to set a date on which he shall enter an order setting aside all entries made on or after November 20, 1995, including the purported judgment. He shall do this on his own initiative or at the instance of either party, upon timely

notice to all parties and as soon as reasonably possible.

On the date selected by Judge Weber, the case shall be treated as finally submitted. Thereafter, within the time prescribed by § 517.111.2, Judge Weber shall enter such judgment as he shall deem proper. In the event of the death or disability of Judge Weber before he enters final judgment, a judge appointed by the Missouri Supreme Court shall enter an order setting aside all entries on or after November 20, 1995, and shall grant the parties a new trial on all issues. *See Stellwagen*, 758 S.W.2d at 197; *Larimer*, 800 S.W.2d at 156.

AHRENS, C.J., and DOWD, J., concur.

*ORDER*

PER CURIAM.

Gary Lossing appeals from the judgment entered in favor of employer, W.E. Walker Company, enjoining him from working in the insurance field within Cape Girardeau County for five years, and permanently enjoining him from disclosing or using information contained in employer's customer ledger. We affirm.

An extended opinion would serve no precedential value. However, the parties have been furnished with a memorandum opinion for their information only, setting forth the reasons for this order. The judgment is affirmed pursuant to Rule 84.16(b).

**W.E. WALKER COMPANY, Plaintiff/Respondent,**

v.

**Gary K. LOSSING, Defendant/Appellant.**

No. 69248.

Missouri Court of Appeals, Eastern District, Southern Division.

Nov. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 8, 1997.

Application to Transfer Denied Feb. 25, 1997.

Stephen C. Wilson, Jackson, for plaintiff/respondent.

Matthew M. Mocherman, Cape Girardeau, for defendant/appellant.

Before AHRENS, C.J., and DOWD and RHODES RUSSELL, JJ.

**Ronald RADFORD, Sr. and Sheila Radford, Plaintiffs– Appellants,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant– Respondent.**

No. 70901.

Missouri Court of Appeals, Eastern District, Northern Division.

Nov. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 8, 1997.

Application to Transfer Denied Feb. 25, 1997.

Paul R. Williams, Bowling Green, for plaintiffs–appellants.

Mark S. Wasinger, Hannibal, for defendant–respondent.

Before AHRENS, C.J., and DOWD and HOFF, JJ.

### ORDER

*PER CURIAM.*

Sheila and Ronald Radford, Sr. (the Radfords) appeal a summary judgment entered by the trial court in favor of State Farm Mutual Automobile Insurance Company (State Farm). This matter arose out of a fatal accident on December 31, 1984 involving the Radfords' son while he was a passenger in an uninsured 1965 Impala owned by his parents. At the time of the accident, the Radfords owned a 1980 Marquis insured by State Farm, but the 1965 Impala was uninsured.

On November 14, 1994, the Radfords filed suit against State Farm seeking to collect $25,000, the policy limit of their uninsured motorist coverage on the 1980 Marquis. State Farm filed a motion for summary judgment. The trial court entered summary judgment in favor of State Farm for two reasons.

In its order, the trial court found that because the Radfords did not bring this action within the three year time limitation under § 537.100 RSMo 1979, as prescribed by the wrongful death statute, § 537.080 RSMo 1979, their action is time barred. We find this issue dispositive and accordingly, affirm the summary judgment.

No error of law appears. An extended opinion reciting the detailed facts and restating the principles of law would have no precedential or jurisprudential value. Judgment affirmed in accordance with Rule 84.16(b).

STATE of Missouri, Plaintiff/Respondent,

v.

James H. McKINNEY, Defendant/Appellant.

James H. McKINNEY, Movant/Appellant,

v.

STATE of Missouri, Respondent/Respondent.

Nos. 67992, 69880.

Missouri Court of Appeals, Eastern District, Division One.

Nov. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 1997.

Raymund J. Capelovitch, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, for respondent.

Before DOWD, P.J., and REINHARD and GARY M. GAERTNER, JJ.

### ORDER

PER CURIAM.

Defendant appeals after he was convicted by a jury of two counts of robbery in the first degree, § 569.020, RSMo 1994. The court found defendant to be a prior and persistent offender and sentenced him to two consecutive twenty-five year prison terms. Defendant also appeals the denial, without an evidentiary hearing, of his Rule 29.15 motion for post-conviction relief. Defendant does not address any points in his appeal to the denial of his Rule 29.15 motion. Therefore, that appeal is considered abandoned. *See State v. Nelson,* 818 S.W.2d 285, 287 (Mo.App. E.D. 1991).

We have reviewed the record and find the claims of error are without merit; the judgment of the motion court is based on findings of fact that are not clearly erroneous. An

opinion would have no precedential value nor serve any jurisprudential purpose. The parties have been furnished with a memorandum for their information only, setting forth the reasons for this order affirming the judgment pursuant to Rules 30.25(b) and 84.16(b).

**STATE of Missouri, Plaintiff–Respondent,**

v.

**Tommy Lee JORDAN, Defendant–Appellant.**

No. 20817.

Missouri Court of Appeals,
Southern District,
Division 1.

Nov. 15, 1996.

Motion for Rehearing or Transfer to Supreme Court Denied Dec. 4, 1996.

Application to Transfer Denied Jan. 21, 1997.

Lee H. Bushie, John D. Beger, Rolla, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, for plaintiff-respondent.

GARRISON, Judge.

Tommy Lee Jordan (Defendant) was convicted of first degree murder, § 565.020.1, and armed criminal action, § 571.015, RSMo 1994, for which he received sentences of life, without eligibility for parole, and twenty-five years, respectively.

Rick Brown (decedent), who lived in Kansas City, was previously married to Defendant's wife, Kari, and was the father of her three-year-old son (C.B.). Defendant lived near Eminence, Missouri, with Kari, C.B., and Kari's daughter.

Decedent was scheduled to pick up C.B. on December 31, 1994 to exercise visitation privileges. When decedent arrived that morning at an apartment in Eminence where his girlfriend was staying, however, Defendant was waiting to tell him that he could not take C.B. *According to Defendant, when he did* so, decedent screamed that Defendant was going to die and started opening a shaving kit he was carrying. Defendant testified that he reached into his truck for a gun after pushing decedent to the ground and knocking the shaving kit from his hands. When he looked back, he saw that decedent was still on the ground but was turning to point a pistol at him.[1] He said that he then shot decedent three times while he was on the ground and once after he got up. Decedent died as a result of the wounds he received.

At Defendant's request, the trial court instructed on self-defense. In this appeal from his convictions, Defendant challenges the trial court's exclusion of evidence which he says indicated that decedent had been sexually abusing C.B., and its admission of evidence concerning his prior arrest for DWI. We affirm.

In his first point on appeal, Defendant alleges error because the trial court sustained the State's motion in limine and rejected his offer of proof concerning evidence that decedent had sexually abused C.B., an allegation which he says he communicated to decedent both before and at the time of the occurrence in question.[2] In support, he contends that (1) when self-defense is an issue, all circumstances under which the homicide occurred are admissible, which would "throw light upon the transaction as it presented itself to [him], or could have affected him in his actions or apprehensions of danger"; (2) the evidence would have assisted the jury in deciding the veracity of Defendant's testimony about the decedent's actions and whether he would have reacted in an aggressive manner; and (3) the evidence was relevant to Defendant's state of mind. As we understand the premise of Defendant's point, it is that decedent would be expected to react violently if he had been told that Defendant had discovered decedent's conduct with his son and was going to expose it.

In support of this contention, Defendant relies primarily on *State v. Burns,* 312 Mo.

---

1. There was evidence that, following the shooting, no pistol was found at the scene which could be linked to decedent.

2. The only evidence referred to by Defendant in support of his contention that he communicated these allegations to decedent before the day of the shooting is his offer to prove that he made comments to decedent's father. There was no evidence, however, that these statements were ever communicated to decedent.

673, 280 S.W. 1026 (1926), a case in which the defendant was convicted of assault with intent to kill. The evidence was that the victim was approaching defendant and his wife on the street; the victim had his hands in his pockets, and had an insolent attitude and "queer" look; and the defendant shot the victim when he saw his hands move and presumed he was about to draw a weapon. The trial court, however, had excluded evidence that the victim had earlier made improper advances toward the defendant's wife which she reported to defendant, and that defendant had sent a third person to the victim to demand that he stop such conduct. The supreme court described the issue as whether the excluded evidence should have been admitted as tending to explain the defendant's conduct when he shot the victim, to aid the jury in deciding who was the aggressor, and in determining the reasonableness of defendant's fear. *Id.* 280 S.W. at 1029. It held that the exclusion of that evidence was reversible error. *Id.* 280 S.W. at 1033.

Factually, the instant case is distinguishable from *Burns*. Here, the jury heard other evidence of hostility between decedent and Defendant, including conduct and statements by decedent which Defendant understood to be threats that he would be shot. Defendant testified that he and Kari started living together before her marriage to decedent was dissolved, and hostility apparently developed between him and decedent over the next several months. At one point, Defendant was injured in a motorcycle accident and was told by a friend that decedent had said that he (decedent) was going to finish Defendant off with a lead pipe.

Defendant also testified about a phone conversation when he told decedent that he could not take C.B. to his home in Kansas City for extended visits unless he used a licensed day care center, whereupon decedent said, "I'll pop a cap in your a__ over this." Defendant said he interpreted that as meaning decedent was going to shoot him. He also testified about an incident following a visit by himself, decedent and C.B. to a psychologist's office in which decedent "pointed at me and went bang, bang, bang, and then he drove off." This evidence alone

may have been sufficient to demonstrate the animosity allegedly harbored by the decedent so that the exclusion of the evidence referred to in this point, even if error, may be considered harmless. *See State v. Malone*, 39 S.W.2d 786, 789 (Mo.1931).

■ Although Defendant includes the granting of the State's motion in limine in his allegation of error, we note that the granting of such a motion is interlocutory only and does not, in itself, raise an issue for appeal. *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992). When a motion in limine is granted, the proponent of the evidence, in order to preserve the issue for appellate review, must attempt to present the excluded evidence at trial, and if an objection is sustained, must make an offer of proof. *Id.*

Defendant made an offer of proof concerning evidence of decedent's sexual abuse of C.B., which was rejected by the trial court. Included was the testimony of Defendant, Kari, and her parents, presented out of the hearing of the jury. Kari's parents testified about changes they noticed in C.B.'s behavior after having been with decedent, including anger and clinging to Defendant and Kari. Kari testified that after decedent's visitations, C.B. could not sleep, he had nightmares, he would hide when he heard cars, and he became angry. She also said that when she would change C.B.'s diaper he would cover his penis and say "don't bite," and that he also stuck "his finger up his hind end and said it hurts."

Defendant also testified as part of his offer. He said that when he was changing C.B.'s diaper after his first visit with decedent, C.B. "covered up himself and said, don't bite pee pee, Da." C.B. said the same thing on other occasions and would point at his rectum and say "hurt, Da, hurt." He also said that he asked C.B. who was biting his "pee pee" and he said "Rick is, Da." Defendant said that convinced him "that there was something going on that shouldn't have been going on," and that was "the reason [he] went to confront [decedent] that morning then, to stop the visitation."

■ An offer of proof should be specific and in sufficient detail to demonstrate the

admissibility of the excluded evidence. *State v. Townsend,* 737 S.W.2d 191, 192 (Mo. banc 1987); *see also State v. Dixon,* 668 S.W.2d 123, 126 (Mo.App.S.D.1984) (an offer of proof must demonstrate that the excluded evidence is relevant and material). Defendant's contentions under this point all hinge on the communication to decedent of his beliefs about decedent's conduct with C.B. He argues:

It is this type of evidence, that deceased had a motive in acting aggressively toward him, that Appellant sought to introduce. Specifically, that Appellant suspected decedent of sexually abusing [C.B.] and he was going to pursue it by taking [C.B.] to a psychiatrist. Under those circumstances, the jury could infer decedent would react in an aggressive manner towards Appellant, especially if Appellant's suspicions were true, in which case it could be expected decedent might react in a deadly manner to try to conceal his improprieties with his infant son.

The excluded evidence about which Defendant complains, however, does not establish that he ever communicated these allegations to decedent. In his offer of proof, Defendant testified as follows:

Q. In your own mind, was that, did that convince you that there was something going on that shouldn't have been going on?

A. Yes, and this—

Q. Is that the reason you went to confront Rick that morning then, to stop the visitation?

A. Yes.

While Defendant testified in his offer that the *reason* he went to meet decedent the morning of the shooting was to stop the visitation because of what he believed, he did not say that this was told to decedent. Later, in Defendant's offer, he testified:

Q. The confrontation down here that morning between you and Rick Brown, did he admit to this molestation to you?

A. He said, I can do with my kid on my time whatever I want to.

This was not evidence that Defendant had actually communicated his accusations to decedent. By this question, Defendant's counsel apparently sought to create an inference that such an accusation had been made. Defendant's answer, however, was not responsive to the question as phrased. We do not construe this answer as constituting evidence that Defendant actually confronted decedent with allegations of sexual abuse. It certainly does not require a reversal on the basis argued by Defendant.

It is significant to note that the trial court did not preclude Defendant from testifying about what he told decedent. At trial, the State objected when Defendant started to testify about what he told decedent on the morning of the shooting, anticipating that Defendant was going to testify that he accused decedent of sexual abuse. The prosecutor argued that sexual abuse did not relate to the Defendant's fear of the decedent. In response to the objection, Defendant's counsel stated that Defendant was going to testify that "he confronted the deceased with the fact that, that I know that you've sexually molested these kids," [3] and theorized that that was why decedent made an attempt to kill Defendant. Defendant's counsel also argued that the decedent's reaction to this accusation was what triggered the self-defense.

The trial court, rather than preventing Defendant from testifying about what he told decedent, said, "I'm going to let him answer the question once, but I don't want you dwelling on it." The court also said, "... I'm going to overrule the State on this and let you elicit what was said, but limit it to one time, if you can." The following then occurred:

(Defendant's counsel): Now, tell the jury what happened then when [decedent] came up to you.

A. I said, Rick, I know what you've been doing to [C.B.]. I know what you have done to [M.]. You're not going to get [C.B.] this weekend and I'm taking the kids to a psychiatrist to get proof next week.

---

3. Defendant apparently contended that decedent had also abused Kari's daughter.

(Defendant's counsel): What happened after that?

A. He screamed at me, you're not going to do nothing but die, MF, and he had a shaving kit. He started opening the shaving kit. I reached out and slapped the shaving kit down. He went for the shaving kit, I nudged him, pushed him. He went on down to the ground. I turned back to my truck, got my gun out, spun around with it in one hand. He was on the ground. He had a gun out, a little automatic. He turned to shoot at me and he hit his left arm while he was still on the ground. I said, Rick, no. He went ahead coming up and around with it and I fired three times from my side. At that time he stood on up and pointed away from me, headed away from me, and I shot one more time. At that time he took two or three, four more steps and fell down.

(Defendant's counsel): Were you in fear?

A. He was going to shoot me. Yeah, I was in fear. I was surprised at him a yelling at me like he did and, yes, I was in fear.

There is no indication that the trial court prevented Defendant from testifying that he accused decedent of sexually abusing C.B. To the contrary, the trial court permitted Defendant to answer the open-ended question about what he told decedent that morning after being informed by his counsel that he was going to testify that he accused the decedent of sexually molesting C.B. Defendant did testify that he told decedent he knew what he had been doing to C.B., and that he was going to get proof. Defendant was not restricted by the court in answering the question, and if the accusation had included a specific reference to sexual abuse, he could have said so. We are unable to conclude that the trial court erred as alleged by Defendant.

Another reason why Defendant cannot be heard to complain about the exclusion of this evidence, as it related to his theory of self-defense, appears in the record of the Rule 29.07(b)(4) hearing held by the trial court immediately after sentencing. Defendant's present counsel appeared on his behalf to argue the motion for new trial and represented him at sentencing, including the Rule 29.07(b)(4) proceeding which followed.[4] Defendant's counsel was permitted, at his request, to interrogate Defendant in connection with the inquiry under Rule 29.07(b)(4), at which time Defendant testified, under oath, as follows:

(Defendant's counsel): Do you remember when I first met you in the jail?

A. Yes.

Q. And do you remember what I told you I wanted to hear?

A. You wanted to hear the truth.

Q. And did I tell you that at some point in these proceedings you would be expected to take the stand, whether that be at a new trial or here today as you are doing?

A. Yes, you did.

Q. And did I tell you you would have to tell the truth then?

A. Yes, sir.

Q. Do you remember testifying at your trial?

A. Yes.

Q. And testifying that you shot Rick Brown in self-defense?

A. I remember testifying that, yes.

Q. Was that the truth?

A. No.

Q. You did not shoot Rick Brown in self-defense?

A. No.

Q. Could you tell us, please, why it was that you shot Rick Brown?

A. I shot Rick Brown because he had molested [M.], his six year older sister. He was molesting [C.B.] and because of him and his dad getting into it and I got the phone call the night before, I thought [C.B.] would be molested that day again.

Q. Unless you did something?

A. Unless I got it stopped.

Defendant claimed that his trial counsel told him that justifiable homicide or defense of a third person was not a viable defense because he had not actually seen decedent

---

4. Defendant's present counsel did not represent him at trial.

molesting C.B. He also claimed that trial counsel told him that in order for them to use self-defense in defending the case it would be necessary for him to testify that he saw decedent with a gun. He testified that, although he told his trial counsel what actually happened, his attorney said, "you can't say that," and that he testified at trial as he did because of his attorney's statements.

On cross-examination by the State, Defendant said:

(The Prosecutor): Mr. Jordan, then do you admit here in open court that you committed perjury when you testified before?

A. Yes, sir, I do.

Defendant's counsel later argued to the trial court that the evidence presented after sentencing was in support of his claim of ineffective assistance of counsel. He contended that Defendant's trial counsel was ineffective because if he had permitted Defendant to testify truthfully (that he killed decedent to protect C.B.), the evidence about the molestation of C.B. would have been admissible.

■ Notwithstanding the reasons for presenting this evidence to the trial court in connection with the Rule 29.07(b)(4) inquiry, we are faced with a claim of error based primarily on the theory that the excluded evidence was admissible in connection with Defendant's theory of self-defense. Defendant, however, has voluntarily testified under oath that this theory of defense was fabricated and based on perjured testimony. He therefore asks us to find reversible error based on the validity of a defense which he admits was inapplicable. To do so would constitute a perversion of the appellate process.

Defendant argues that the Rule 29.07(b)(4) inquiry is distinct from the criminal case itself and is for the limited purpose of ascertaining whether probable cause exists to find that he received ineffective assistance of counsel. In support, he cites *State v. Hurtt,* 836 S.W.2d 56 (Mo.App.S.D.1992). This court, in *Hurtt,* acknowledged that the Rule 29.07(b)(4) inquiry is to assist a defendant in providing a remedy if representation has been ineffective, and that an inquiry by the court in that proceeding does not violate a defendant's Fifth Amendment right not to testify against himself. *Id.* at 61. There, however, we held that a defendant's responses to such an inquiry can be considered in weighing his subsequent testimony concerning the ineffectiveness of his counsel. *Id.*

*Hurtt* cannot be stretched to support the argument, which Defendant in effect makes here, that his conviction should be reversed based on the exclusion of evidence which he contends was relevant to his theory of defense, even though he voluntarily admitted in the Rule 29.07(b)(4) hearing that that defense was based on perjury.

■ An admission by a defendant in a postconviction proceeding that he lied to the court in connection with the criminal case is evidence of fraud upon the court. *Foster v. State,* 593 S.W.2d 636, 639 (Mo.App.E.D. 1980). As indicated in *Garner–Roe v. Anderson,* 894 S.W.2d 223, 227 (Mo.App.E.D. 1995), our courts will not condone conduct which constitutes such a fraud. This conduct is not excused, as Defendant seeks to do here, by his allegation that it was a response to what he understood his trial counsel said about the law of self-defense.

Defendant's first point is denied.

In Defendant's second point, he alleges that the trial court erred in admitting evidence that he was was previously arrested for driving while intoxicated, which, he argues, was evidence of other crimes and was not probative evidence concerning the offense charged. The evidence in question was that Defendant was arrested at approximately 11:40 P.M. on December 28, 1994 (less than three days before the shooting in question) within two to two and one-half miles from decedent's residence in Kansas City, which was approximately 300 miles from Defendant's residence in Eminence. When he was arrested, he had four loaded firearms on the passenger seat next to him, each of which had a live shell in the chamber, and he also had additional ammunition in the car. When he was asked what he was doing with the guns, Defendant first said that he was going to visit a friend in Kansas City and that he brought them for protection because he had heard it was a "rough place." Defendant later told the same arresting officer that he had brought the guns to Kansas City to sell,

but when asked why he had a shell in the chamber of each, he said that he was from Eminence where they keep all of their guns loaded. When asked the amount he wanted for the guns, Defendant said, "well, I can't sell them right now." He said, "I've got to use them first" and "then I'll sell them." He refused to answer any additional questions when asked what he was going to use them on.

■ Evidence of a separate, distinct and unrelated crime is generally inadmissible unless the evidence has a legitimate tendency to establish a defendant's guilt of the crime charged. *State v. Henderson*, 826 S.W.2d 371, 374 (Mo.App.E.D.1992). Evidence of a separate offense is admissible if it tends to establish motive, intent, absence of mistake or accident, a common scheme or plan, identity, or the *res gestae. Id.*

A trial court has broad discretion in determining whether to admit or exclude evidence, and we will not interfere with its ruling in the absence of a clear abuse of that discretion. *Id.* It is in the best position to evaluate whether the potential prejudice from relevant evidence outweighs the relevance. *State v. Kenley*, 693 S.W.2d 79, 81 (Mo.banc 1985).

■ In the instant case, the fact that Defendant was arrested for DWI was merely a circumstance surrounding the evidence which was relevant to Defendant's intent to kill decedent, to wit: having several loaded firearms with him, 300 miles from his home at 11:40 P.M., within two and one-half miles of decedent's residence, less than three days before he actually shot decedent, together with the officer's testimony that he said he had to use the firearms before he could sell them.

The trial court did not abuse its discretion under these facts. Defendant's second point is denied.

The judgment is affirmed.

BARNEY, P.J., and PREWITT, J., concur.

Martha BRANDT, Appellant,

v.

Bela CSAKI, Respondent.

No. WD 51050.

Missouri Court of Appeals,
Western District.

Nov. 19, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 24, 1996.

Application to Transfer Denied
Feb. 25, 1997.

Margaret M. O'Leary, Chicago, Illinois, Catherine A. Donnelly, Gregory W. Vleisides, Vleisides, Donnelly & O'Leary, Kansas City, for appellant.

Thomas W. Wagstaff, Gregory J. Minana, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for respondent.

Before EDWIN H. SMITH, P.J., and BRECKENRIDGE and ELLIS, JJ.

BRECKENRIDGE, Judge.

Martha Brandt appeals from the trial court's judgment following a jury verdict for Dr. Bela Csaki in Ms. Brandt's medical malpractice action. Ms. Brandt claims that she suffered nerve injuries as a result of Dr. Csaki's failure to timely diagnose and treat an injury caused by a diagnostic test Dr. Csaki ordered. Ms. Brandt raises seven points on appeal. She claims that the trial court erred by (1) denying her motion for a directed verdict; (2) denying her motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial; (3) allowing her to be impeached with a prior abandoned claim against the doctor who performed the diagnostic test; (4) allowing Dr. Csaki to make adverse reference in closing argument to her failure to call her husband to testify; (5) admitting evidence of Dr. Csaki's successful treatment of the saddle embolus; (6) allowing Dr. Csaki to use an illustration; and (7) admitting Dr. Csaki's testimony concerning his nerve sheath hemorrhage theory.

Because Ms. Brandt had the burden of proof at trial, the trial court did not err in denying her motion for a directed verdict. The trial court also properly denied Ms. Brandt's JNOV or new trial motion because the jury may not have been persuaded by her evidence and, contrary to her argument, Dr. Csaki was not required to present substantial evidence in support of his defense. Further, there was no manifest injustice resulting from the trial court's admission of the evidence challenged by Ms. Brandt in her Points IV through VII. Since Ms. Brandt is not entitled to relief on any of her seven points relied on, the judgment of the trial court is affirmed.

The evidence viewed in a light most favorable to the judgment reveals that while at home, on February 9, 1990, Ms. Brandt experienced severe pain in her groin and legs, as well as numbness and tingling in her feet. Due to her condition, Ms. Brandt was admitted to the Medical Center of Independence, where Dr. Csaki examined her. Dr. Csaki diagnosed Ms. Brandt's problem as a saddle embolus, which is a blood clot located where the aorta bifurcates to become the iliac arteries that become the femoral arteries supplying the legs with blood. To confirm his diagnosis, Dr. Csaki ordered an angiogram for Ms. Brandt which was performed by Dr. Robert Schwegler.

An angiogram is a procedure where a needle is stuck into an artery to insert a catheter. Radiopaque contrast material is then pumped into the artery through the catheter to create a road map of the arteries. Any blockage is apparent in an X-ray of the arterial system. Dr. Schwegler performed the angiogram through the left axillary artery, a major artery in the upper arm near the arm pit. During the angiogram, Ms. Brandt felt a sharp pain like "an electric shock go through the top part of [her] body." Ms. Brandt was in such pain during the angiogram that Dr. Csaki was summoned to the radiology department to authorize medication for her pain.

After Dr. Schwegler performed the angiogram and confirmed Dr. Csaki's diagnosis, Dr. Csaki operated and successfully removed several small blood clots from the lower aorta in Ms. Brandt's groin. During recovery, Ms. Brandt initially had minimal bruising and swelling at the puncture site of the angiogram. On February 16, 1990, she began to experience numbness and tingling in her left arm, along with bruising and swelling down to the elbow area. At approximately 8:00 a.m. on that date, Dr. Kunz, a radiologist, examined Ms. Brandt in response to her complaints of tingling and numbness. Dr. Kunz ordered periodic measuring of her arm to see if the swelling was stable and monitoring of her complaints. He noted on her chart that he "would expect this to resolve."

On February 17, Ms. Brandt began experiencing significant pain, numbness and loss of motor functions in her hand. After being informed of this condition, Dr. Csaki ordered a Doppler ultrasound to diagnose Ms. Brandt's problems. The ultrasound revealed

a small pseudoaneurysm in the artery where the angiogram had been performed. A pseudoaneurysm is a soft blood clot and is a known risk of the angiogram procedure. The pseudoaneurysm was caused by the puncture of the artery during the angiogram. Dr. Csaki determined that Ms. Brandt needed to have the pseudoaneurysm surgically removed.

The surgery could not be performed immediately, however, because Ms. Brandt was on a blood thinning medication, Coumadin. Dr. Csaki prescribed Vitamin K to reverse the blood thinner, but it took three days to take effect. Although, there were quicker methods available to reverse the effect of the blood thinner, they would have increased the risk of blood clots, which could have been life threatening. Dr. Csaki determined that these other options posed too high a risk, considering that Ms. Brandt had a bad mitral value in her heart, artrial fibrillation and, as an individual who has already had an embolus, was at an increased risk of having a recurrence. As a result, the removal of the pseudoaneurysm did not occur until February 20. Two months later, Ms. Brandt was diagnosed with permanent nerve injury to her left arm, although the extent of the injury at the time of trial was disputed.

Ms. Brandt originally brought a medical malpractice action against Dr. Schwegler, the Medical Center of Independence and Dr. Csaki for causing her nerve damage. Her first amended petition named only Dr. Csaki, however, alleging that his delay in diagnosing and removing the pseudoaneurysm negligently caused her injury.

Trial commenced on February 14, 1995. Ms. Brandt presented her theory that Dr. Csaki was negligent in failing to diagnosis and treat her when he was notified of the loss of motor function in Ms. Brandt's arm on February 17, 1990. Her expert testified that the pseudoaneurysm at the site of the angiogram compressed the nerves in her arm, and immediate relief of the pressure was imperative because the longer the nerve was compressed, the greater the likelihood of permanent injury. She claimed Dr. Csaki deviated from the standards of care of his profession by failing to diagnose an emergency situation

when he was notified of the loss of motor functions, and that the delay in treatment caused permanent nerve damage.

In his defense, Dr. Csaki introduced evidence that Ms. Brandt's nerve injury was the result of a hemorrhage within the sheath covering the median nerve, which was caused when the nerve was struck during the angiogram, and was not the result of pressure on the nerve caused by the pseudoaneurysm. Dr. Csaki and his expert, Dr. Robert Williams, testified that, to a reasonable degree of medical certainty, any alleged delay in diagnosing and removing the pseudoaneurysm from Ms. Brandt's arm was not the cause of her injury. According to their testimony, Ms. Brandt's nerve had been completely and irreversibly injured by the time the angiogram was completed.

In addition, Dr. Csaki and his expert testified that he timely diagnosed the pseudoaneurysm. In their view, the symptoms originally exhibited by Ms. Brandt were consistent with normal reactions to an angiogram, and did not indicate any unusual circumstance until February 17. At that time, Dr. Csaki ordered the Doppler ultrasound, which was performed the next morning and revealed the pseudoaneurysm. Dr. Williams testified that Dr. Csaki exercised correct judgment "in not operating as an emergency, and letting her Coumadin drift down to a reasonable level where he could operate without risk of undue bleeding, knowing there was a risk to the arm, but that being overshadowed by the risk of a new blood clot that would be catastrophic."

During the trial, Ms. Brandt moved for a directed verdict, which the trial court denied. After the jury entered a verdict in favor of Dr. Csaki, Ms. Brandt filed a motion for a JNOV or, in the alternative, a new trial, arguing that the jury's verdict was against the weight of the evidence. The trial court overruled Ms. Brandt's motion and she filed a timely appeal.

In her first point on appeal, Ms. Brandt contends that the trial court erred by denying her motion for a directed verdict because the evidence established that her injury was caused by Dr. Csaki's failure to properly and

timely diagnose and treat her nerve compression. She argues that any defense theory of the cause of her injury was unsupported by competent and substantial evidence.

▮ An appeal of the denial of a motion for a directed verdict involves only questions of law. *Hammer v. Waterhouse,* 895 S.W.2d 95, 99 (Mo.App.1995). A directed verdict should only be granted if reasonable persons could not differ as to the outcome of the case. *Id.* A verdict is generally not directed in favor of the party with the burden of proof "no matter how overwhelming that party's evidence may be or how minuscule the other party's evidence may be; a directed verdict in favor of the party having the burden of proof (usually the plaintiff) is never based upon [that party's] evidence." *Brandt v. Pelican,* 856 S.W.2d 658, 664 (Mo. banc 1993). The rationale underlying this principle is that the party with the benefit of the burden of proof does not have to present any evidence at all, and can rely solely on the jury disbelieving the other party's evidence. *Id.* at 664–65.

▮ The exception to this rule is when there are no questions of fact left in the case upon which the jury may pass, but only questions of law which would not be decided by the jury. *Id.* at 664. This occurs when the non-movant admits, in pleadings, by counsel in open court or by testimony at trial, the truth of all facts upon which the claim of the movant rests. *Id.* It may also occur when "the proof is altogether of a documentary nature and the authenticity and correctness of the documents are unquestioned, and if such proof is unimpeached and uncontradicted...." *Id.*

▮ The trial court did not err in denying Ms. Brandt's motion for a directed verdict. As the plaintiff, she had the burden of proof. Dr. Csaki did not admit the truth of the basic facts upon which Ms. Brandt's claim rests. Nor does this case involve documentary evidence, the nature, authenticity and correctness of which are unquestioned. Therefore, Dr. Csaki was entitled to have the case go to the jury. Point I is denied.

As an additional point of error, Ms. Brandt claims the trial court wrongfully denied her motion for a JNOV or, in the alternative, a new trial because the evidence incontrovertibly showed that her nerve injury was caused by Dr. Csaki's negligence. She also claims that the trial court erred by failing to grant her a new trial because the verdict is against the weight of the evidence.

▮ In reviewing the verdict of a jury in a civil case, the appellate court does not "determine the credibility of the witnesses, resolve conflicts in testimony, or weigh the evidence." *Powell v. Norman Lines, Inc.,* 674 S.W.2d 191, 197 (Mo.App.1984) (quotation omitted). It is within the prerogative of a jury to find against the party with the burden of proof, even if that party's evidence is uncontradicted and unimpeached. *Parsons Construction Co. v. Missouri Public Serv. Co.,* 425 S.W.2d 166, 172 (Mo.1968). Here, Dr. Csaki did not have to offer any evidence to support a verdict in his behalf. *Id.* Therefore, because Ms. Brandt had the burden of proof, rather than Dr. Csaki, her claims based on the sufficiency and weight of the evidence are without merit. Point II is denied.

▮ As her third point on appeal, Ms. Brandt claims the trial court erred by allowing Dr. Csaki to cross-examine her concerning her prior abandoned malpractice claim against Dr. Schwegler, the doctor who performed the angiogram. The trial court is vested with discretion in determining the scope and extent of cross-examination. *Embree v. Norfolk & Western Ry. Co.,* 907 S.W.2d 319, 325 (Mo.App.1995). This court will not overrule the trial court's decision unless it clearly abused that discretion. *Id.*

▮ During cross-examination, Dr. Csaki asked Ms. Brandt whether she had abandoned a prior pleading alleging that Dr. Schwegler caused her injury while performing the angiogram. Ms. Brandt objected to this line of questioning but the trial court overruled her objection. Ms. Brandt does not dispute that she abandoned her claim against Dr. Schwegler by omitting him from her amended petition. When an amended petition is filed, the original petition is abandoned by the subsequent filing. *Evans v. Eno,* 903 S.W.2d 258, 260 (Mo.App.1995).

Although Dr. Csaki's counsel asked her several questions, only one question was answered by Ms. Brandt. That question and answer are as follows:

Q. Ms. Brandt, you have previously filed documents in which you state that Dr. Schwegler performed an aortagram via the left axillary approach and that that's what caused you severe and permanent injuries of the median nerve, haven't you?

A. At that time, that's what I thought.

 Missouri courts have consistently held that abandoned pleadings containing statements of fact are admissible as admissions against interest against the party who originally filed the pleading. *Carter v. Matthey Laundry & Dry Cleaning Company*, 350 S.W.2d 786, 791 (Mo.1961); *Lazane v. Bean*, 782 S.W.2d 804, 805 (Mo.App.1990); *DeShon v. St. Joseph Country Club*, 755 S.W.2d 265, 268 n. 1 (Mo.App.1988). Only allegations of fact are admissible; conclusions of law are not admissible to impeach the witness. *Lazane*, 782 S.W.2d at 805. "It has been held that extra judicial admissions are competent evidence even though in the form of conclusions as to the ultimate fact at issue." *DeArmon v. City of St. Louis*, 525 S.W.2d 795, 803 (Mo.App.1975) (quotation omitted). Therefore, the question before this court is whether Ms. Brandt's abandoned pleading consisted of admissible statements of facts or inadmissible conclusions of law.

This case is quite similar to the factual situation of *Lazane*. In *Lazane*, the plaintiff filed a medical malpractice action against numerous doctors, a hospital and a professional corporation. 782 S.W.2d at 805. In the plaintiff's final amended petition, no defendants were named except Dr. Bean and the hospital. *Id.* The plaintiff was cross-examined with respect to the allegations in his prior pleading that a doctor, other than Dr. Bean, was responsible for the care and treatment of the plaintiff. The court affirmed the trial court's decision to allow the abandoned pleadings to be used for impeachment because they consisted of statements of fact inconsistent with the plaintiff's present claim. *Id.* at 806.

Here, Ms. Brandt originally named the Medical Center of Independence and Drs. Schwegler and Csaki in her petition, on the grounds that all were responsible for her injuries. In her final amended petition, Ms. Brandt named only Dr. Csaki as a defendant. In Ms. Brandt's abandoned pleading against Dr. Schwegler, she alleged that Dr. Schwegler "improperly, inadequately and insufficiently performed a thoracoabdominal aortogram" which caused a pseudoaneurysm, and he failed to discover and treat the injury, or inform Ms. Brandt of the injury. In addition, Ms. Brandt alleged that there was a causal relationship between Dr. Schwegler's actions and her permanent injury. Such statements are not legal conclusions even though they are in the form of conclusions as to the ultimate facts at issue. *DeArmon*, 525 S.W.2d at 803. These statements were inconsistent with those in her amended petition, which alleged that Dr. Csaki alone caused her injury. As such, the trial court properly relied upon the authority of *Lazane* in permitting Dr. Csaki to impeach Ms. Brandt with the abandoned pleading. Point III is denied.

 In her fourth point, Ms. Brandt claims the trial court erred by allowing Dr. Csaki to make a negative inference from her failure to call her husband as a witness during the trial. She argues that this reference was improper because her husband had no vital knowledge concerning the case and any testimony he would offer would have been cumulative. Mr. Wagstaff, Dr. Csaki's attorney, made the following closing argument:

Mr. Wagstaff: Thank you, Your Honor. She's told us about problems she has around home, she's told us about problems of things she can't do. We did not hear from her husband, Mr. Brandt did not testify. It's curious, and—

Ms. O'Leary: Objection, Judge. Mr. Brandt's mother died and he was unable to remain and testify yesterday.

Mr. Wagstaff: We didn't hear from Mr. Brandt throughout all of last week and this week and he hasn't talked about problems that he's visualized that she's had, so I think you are allowed to assume that what-

ever he would have said would not have been helpful to her.

The trial court never ruled on Ms. Brandt's objection. It is the objecting party's responsibility to insure that the trial court has heard and ruled on every objection. *Eide v. Midstate Oil Co.*, 895 S.W.2d 35, 41 (Mo.App.1995). The objecting party's failure to obtain a ruling on an objection preserves nothing for appellate review. *Id.* Therefore, Ms. Brandt has not preserved her fourth point on appeal. This court has examined the record for manifest injustice triggering plain error relief and finds none. Point IV is denied.

As her final three points on appeal, Ms. Brandt contends that the trial court erred by admitting evidence of Dr. Csaki's successful treatment of her saddle embolus condition, by admitting an illustration purporting to depict her embolus, and by admitting testimony concerning a nerve sheath hemorrhage theory. For the reasons that follow, this court finds that Ms. Brandt has failed to preserve her last three claims of error.

According to Rule 78.07, allegations of error must be raised in a motion for a new trial in order to preserve them for appellate review. "General allegations in the motion for new trial are adequate if based upon specific objections or requests made during the trial." *Bowman v. Burlington Northern, Inc.*, 645 S.W.2d 9, 11 (Mo.App.1982). However, even in the situation where the appealing party properly objected at trial, as Ms. Brandt did in this case, "the allegations [in the motion for new trial] must be *sufficiently definite to direct the trial court's attention to the particular acts or rulings asserted to be erroneous.*" *Id.* The historical rationale underlying this rule is that the trial court should have the last opportunity to correct any errors it made during the trial before review by the appellate court. *Fruit Supply Co. v. Chicago, B. & Q.R. Co.*, 119 S.W.2d 1010, 1011 (Mo.App.1939).

Here, Ms. Brandt made a general allegation in her motion for new trial purporting to encompass "[a]ll other objections made by Plaintiff to evidence elicited by defendant that were overruled during the course of this trial ... pursuant to Rule 78.07." Although Ms. Brandt made objections with respect to each contention she now raises on appeal, her "catch-all" allegation in her motion fails to direct the trial court's attention with particularity to the alleged errors.

In order to meet the standard of Rule 78.07, the allegations in the motion must be sufficient to give the trial court an opportunity to correct its errors, without requiring the court to resort to aid extrinsic to the motion. *Bowman*, 645 S.W.2d at 12. The rules governing motions for new trial must be strictly enforced. *Id.* at 13. Therefore, Ms. Brandt failed to preserve her final three points on appeal because the trial court was not able to engage in meaningful review without extrinsic assistance. When a claim of error is not properly preserved, the only review is for plain error, reserved for situations where manifest injustice or a miscarriage of justice has occurred. *Hammer*, 895 S.W.2d at 106.

As her fifth claim of error, Ms. Brandt complains that the trial court mistakenly admitted irrelevant evidence of Dr. Csaki's successful treatment of her saddle embolus. The trial court has broad discretion in determining whether evidence is relevant. *Kennedy v. Milligan*, 915 S.W.2d 784, 792 (Mo.App.1996). Relevant evidence is any evidence that "tends to prove or disprove a fact in issue or corroborates other relevant evidence." *Id.*

In this case, Ms. Brandt argues that the evidence was inadmissible because it was not relevant to the performance of the angiogram or the standard of care for treatment of the resulting injury. Ms. Brandt's argument misconstrues the purpose for which the evidence was offered. At no point during the trial did Dr. Csaki argue that the evidence of the successful procedure was relevant to the standard of care for the angiogram. To the contrary, the saddle embolus condition was relevant because there was expert testimony that such a prior condition would affect Dr. Csaki's decisions concerning the treatment of the nerve injury. In light of this testimony,

there is no manifest injustice or miscarriage of justice. Point V is denied.